```
_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
              COUNSEL/PARTIES OF RECORD

              DEC 2 9 2010

         CLERK US DISTRICT COURT
           DISTRICT OF NEVADA
BY:_____ DEPUTY
```

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

In re ZANTE, INC.,                    )
                                      )
        Debtor.               )
                                      )
_____       )
                                      )
HERBST GAMING, INC. et al.,           )        3:10-cv-00231-RCJ-RAM
                                      )
        Plaintiffs,           )        **ORDER**
                                      )
    vs.                          )
                                      )
INSURCORP et al.,                     )
                                      )
        Defendants.           )
_____       )

     This case is an adversary proceeding, (*see* Adv. No. 09-05041-GWZ), arising out of the consolidated Chapter 11 bankruptcy cases of Plaintiffs and others, (*see In re Zante, Inc.*, No. BK-N-09-50746-GWZ). Defendants Loomis Co. and Loomis Benefits, Inc. (collectively, "Loomis") have moved for the Court to withdraw the reference (of the adversary proceeding) and for summary judgment. For the reasons given herein, the Court grants the motion to withdraw the reference and grants the motion for summary judgment in part.

## I.    FACTS AND PROCEDURAL HISTORY

     According to the First Amended Complaint ("FAC"), prior to 2006 Plaintiffs Herbst Gaming, Inc., HGI-Lakeside, Inc., HGI-St. Jo, Inc., and HGI-Mark Twain, Inc. (collectively, "Herbst") provided medical insurance to employees through a "fully-insured" program, under

1   which Herbst paid an aggregate monthly premium to a provider, who then paid employees'

2   medical expenses minus co-pays, deductibles, and other limitations. (FAC ¶ 23, ECF No. 35 in

3   Adv. No. 09-05041-GWZ). In 2007, Herbst switched to a "self-funded" program, under which

4   an employer pays for its employee's medical expenses directly while administering the policy

5   itself or engaging a third party to administer it. (*Id.* ¶ 24). Under such a program, an employer

6   sometimes purchases "stop loss" insurance, whereby an insurer reimburses the employer for

7   expenses above a predetermined limit. (*Id.*).

8       **A.    The 2007 Policy**

9        In early 2006, Mr. Cruden, a representative of Defendant Insurcorp, first contacted Herbst

10   about converting to a self-funded program for 2007. (*Id.* ¶ 25). Insurcorp prepared and circulated

11   a Request for proposal ("RFP"), which is a notice sent to insurance carriers to solicit offers, for a

12   stop loss policy for self-funded group health, dental, disability, and life insurance. (*Id.* ¶ 27).

13   Defendant Loomis responded to Insurcorp with a quote for coverage to be provided by AIG. (*Id.*

14   ¶ 29). In or about August 2006, Insurcorp represented to Herbst that AIG was offering a "12

15   month/15 month" stop loss policy. (*Id.* ¶ 30). Such a policy covers claims that are made within

16   the twelve-month period of the policy and that are paid by the administrator as late as three

17   months after the twelve-month coverage period expires. (*Id.* ¶ 30). Through Insurcorp, Herbst

18   and AIG entered into the stop loss policy ("the 2007 Policy"), coverage under which began on

19   January 1, 2007. (*Id.* ¶¶ 31–32).

20        Herbst alleges that AIG failed to provide coverage consistent with the quote. (*See id.*

21   ¶ 33). Herbst alleges "[b]y January/February 2007, AIG surreptitiously issued a new quote that

22   included terms very different from (and less favorable [than]) those contained in the original

23   Quote, including but not limited to a 12 month/12 month contract term that did not include

24   [prescription] coverage in the aggregate . . . ." (*Id.*). Mr. Bixlar, a representative of Defendant

25   Loomis, Plaintiff's third-party plan administrator, attempted to conceal the error rather than

1   notify Plaintiffs of it. (*Id.* ¶¶ 17, 34). Finally, in April 2007, a Party that Herbst does not identify

2   in the FAC presented Plaintiffs with a written contract "that Plaintiffs believed provided

3   coverage consistent with the [earlier,] accepted quote" for Herbst to sign along with AIG. (*Id.*

4   ¶ 36). Herbst signed that document. (*Id.* ¶ 39).[1] Herbst alleges it executed a written

5   contract—the 2007 Policy—that it did not closely read at signing because it had not yet been

6   provided with or informed of the later quote, and that Defendants knew that Herbst was operating

7   under the assumption that the written contract it was signing represented the terms of the earlier

8   quote the parties had negotiated. (*See id.*).

9        The amount Herbst was liable to pay under the 2007 Policy before AIG became liable for

10   "stop loss" was called the Annual Aggregate Attachment Point ("AAAP"). (2007 Policy 6, ECF

11   No. 35-1). The AAAP cannot be calculated until the end of a coverage period, because it equals

12   "the greater of the cumulative total of the Monthly Aggregate Attachment Points for the

13   Coverage Period and the Minimum Aggregate Attachment Point." (*Id.*). The Monthly Aggregate

14   Attachment Point was calculated for each calendar month by multiplying the number of covered

15   employees for a given month by each employee's rate for his or her category (single or family).

16   (*See id.* 5, 8). At a minimum, Herbst was liable to pay the Minimum Aggregate Attachment

17   Point of $2,208,221. (*See id.* 5). Herbst alleges the AAAP under the 2007 Policy was $2,350,000

18   (the "2007 AAAP"), which indicates that the monthly variations in employee totals in each

19   category of coverage caused the cumulative totals of the Monthly Aggregate Attachment Points

20   to exceed the Minimum Aggregate Attachment Point. (FAC ¶ 40). Based on the 2007 AAAP, an

21   unidentified Loomis representative informed an identified Insurcorp representative by email in

22   February 2008 that Herbst was entitled to $194,000 in reimbursement under the 2007 Policy. (*Id.*

23   ¶ 41).

24

25   _____

[1] Although Plaintiffs admit signing the 2007 Policy, the copy of the 2007 policy Plaintiffs have attached does not appear to bear any signatures except those of AIG's representatives.

1    At a December 2008 meeting between unidentified Herbst and Insurcorp representatives,

2    Herbst first realized that the terms of the 2007 Policy it signed were different than those of the

3    quote to which it had orally agreed. (*Id.* ¶ 44). The Insurcorp representative informed the Herbst

4    representative that approximately $729,000 in employee claims made in 2007, but paid during

5    the first three months of 2008, were not covered, and that Herbst was also not entitled to a

6    $194,000 reimbursement for certain claims both made and paid in 2007, because the 2007 Policy

7    did not cover prescription drugs in the aggregate. (*Id.* ¶¶ 44, 46). Herbst alleges that this was

8    contrary to the agreement between it and AIG and that Insurcorp had in fact spoken and acted

9    consistently with Herbst's understanding of the agreement in the past. (*See id.* ¶¶ 45, 47).

10   **B.   The 2008 Policy**

11   In mid-2007, Herbst negotiated a new stop loss policy through Insurcorp for 2008.

12   Herbst agreed to increase the Specific Deductible[2] from $75,000 to $100,000 and to "laser" three

13   employees at $420,000, meaning that this would be the collective deductible for these three

14   employees. (*Id.* ¶ 49). In return, Herbst's fixed costs (premium) and AAAP would not change,

15   and Insurcorp assured Herbst of this. (*Id.* ¶ 51). Loomis represented to Insurcorp on December

16   26, 2007 that it could maintain the 2007 premium in exchange for the deductible increases. (*Id.*

17   ¶ 52). Based on this understanding, Herbst anticipated that its liability in 2008 would be

18   approximately the same as its liability in 2007, and it executed a new policy (the "2008 Policy")

19   in or about April 2008. (*Id.* ¶¶ 53–54).

20   The 2008 Policy as written and executed was a 12 month/15 month policy that covered

21   prescription drugs in the aggregate, as Herbst had originally anticipated the 2007 Policy would

22   be, and as Herbst of course expected the 2008 Policy to be, as well. (*Id.* ¶ 55). Herbst complains

23   of this change made without its knowledge at the same time it complains that the 2007 Policy did

24   

25   [2]This is the amount the employer must pay in expenses for each individual employee before AIG becomes liable for the excess.

1  not contain these same terms, which it desired and expected. (*See id.*).  Herbst also complains,

2  however, that it first discovered at the December 2008 meeting that the specific and aggregate

3  factors (the amount to be multiplied by the number of employees to determine the Monthly

4  Aggregate Attachment Points) under the 2008 Policy had increased 65–80% over the factors

5  under the 2007 Policy, leading to liability of approximately $4,000,000 in 2008, approximately

6  $1,700,000 of which would have been covered by stop loss under the 2007 Policy's factors. (*Id.*

7  ¶ 56).

8        Herbst also alleges Loomis was negligent in: (1) failing to provide information to AIG,

9  requiring large lump payments by Herbst to AIG in 2008 to prevent withholding of future

10  reimbursements; and (2) failing to provide AIG with certain historical claims information for

11  approximately five months after being notified of AIG's need for the information, but rather

12  attempting to renegotiate the terms of the contract with AIG, without Herbst's knowledge or

13  consent, resulting in a 12% premium increase in mid-2008. (*Id.* ¶¶ 57–59).

14        **C.    The Present Adversary Proceeding**

15        Plaintiffs are each Debtors in a consolidated Chapter 11 bankruptcy case in this District.

16  (*See In re Zante, Inc.*, No. BK-N-09-50746-GWZ).  Plaintiffs/Debtors Herbst brought the present

17  adversary proceeding against Defendants Insurcorp, Loomis, and AIG Life Insurance Co., suing

18  on nine causes of action: (1) Turnover of Property to the Estate Under 11 U.S.C. § 542; (2)

19  Professional Negligence/Negligence; (3) Breach of Contract; (4) Negligent

20  Misrepresentation/Concealment; (5) Breach of Fiduciary Duty; (6) Fraud in the Inducement; (7)

21  Fraudulent Representation/Concealment; (8) Tortious Breach of the Implied Covenant of Good

22  Faith and Fair Dealing; and (9) Reformation of Contract. (*See* FAC, ECF No. 35 in Adv. No. 09-

23  05041-GWZ).  Defendants have moved to withdraw the reference of the adversary proceeding to

24  this Court, which motion opened the present case, No. 3:10-cv-00231-RCJ-RAM.  Also, Loomis

25  has moved for summary judgment.

1  II.    **LEGAL STANDARDS**

2        A.    **Withdrawal of the Reference**

3        The Supreme Court has ruled that a bankruptcy court—the judges of which are not

4  afforded the protections of life tenure and irreducible salary given to judges under Article III of

5  the Constitution—cannot enter final judgments on matters traditionally decided by Article III

6  judges, such as contract disputes. *See Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir.

7  2004) (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)).  Congress

8  amended the Bankruptcy Code to conform to this ruling, distinguishing "core" bankruptcy

9  proceedings from "non-core" proceedings. *Id.*  Congress has enumerated what it considers to be

10  core proceedings, *see id.* (citing 11 U.S.C. § 157(b)(2)), but it has not enumerated non-core

11  proceedings, *see id.*  "Non-core" proceedings are those that "do not depend on the Bankruptcy

12  Code for their existence and . . . could proceed in another court." *Id.* (citing *Sec. Farms v. Int'l*

13  *Bhd. of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997)).

14        A bankruptcy court may hear and finally determine bankruptcy cases under Title 11 and

15  proceedings arising under Title 11 or arising in a case under Title 11. *See* 11 U.S.C. § 157(b)(1).

16  A bankruptcy court may hear a non-core proceeding but must submit proposed findings of fact

17  and conclusions of law to the district court for final determination de novo. § 157(c)(1).  The

18  Ninth Circuit has adopted the Fifth Circuit's reasoning in distinguishing three types of

19  proceedings: (1) those "arising under" Title 11; (2) those "arising in" a case under Title 11; and

20  (3) those "related to" a case under Title 11, which are the three categories of cases over which

21  district courts have subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b):

22        28 U.S.C. § 157(b) defines core proceedings as ones "arising under title 11,
       or arising in a case under title 11," and gives a nonexhaustive list of types of core
23        proceedings. "Arising under" and "arising in" are terms of art. They are two of the
       three categories of cases over which district courts have jurisdiction under 28 U.S.C.
24        § 1334(b). The third category includes cases "related to" a case under title 11. As
       the Fifth Circuit has explained,

25

Page 6 of 22

> Congress used the phrase "arising under title 11" to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11 . . . . The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise only in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

> The court concluded: "If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but . . . it is an 'otherwise related' or non-core proceeding."

*In re Eastport Assocs.*, 935 F.2d 1071, 1076–77 (9th Cir. 1991) (citations omitted) (quoting *In re Wood*, 825 F.2d 90, 96–97 (5th Cir. 1987) (footnotes omitted)).

Upon motion or sua sponte a district court may withdraw, in whole or in part, any case or proceeding under § 157. 11 U.S.C. § 157(d). A district court must upon timely motion withdraw a proceeding if it determines "that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.* The party moving for withdrawal has the burden of persuasion. *See In re First Alliance Mortg. Co.*, 282 B.R. 894, 902 (C.D. Cal. 2001).

Although a bankruptcy court may not finally determine non-Title 11 issues, the presence of such an issue does not mandate withdrawal of the reference. *In re Vicars Ins. Agency*, 96 F.3d 949, 953 (7th Cir. 1996). Rather, withdrawal is mandatory "in cases requiring material consideration of non-bankruptcy federal law." *Sec. Farms*, 124 F.3d at 1008. Put differently, "mandatory withdrawal is required only when those issues require the interpretation, as opposed to mere application, of the non-title 11 statute, or when the court must undertake analysis of significant open and unresolved issues regarding the non-title 11 law." *Id.* at 954. Permissive withdrawal is allowed, however, "for cause shown," 11 U.S.C. § 157(d), which a district court determines by considering "the efficient use of judicial resources (which is enhanced when non-core issues predominate), delay and costs to the parties, uniformity of bankruptcy administration,

1   the prevention of forum shopping, and other related factors." *Sec. Farms*, 124 F.3d at 1008.

2   **B.     Rule 56(c)**

3        The Federal Rules of Civil Procedure provide for summary adjudication when "the

4   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5   affidavits, if any, show that there is no genuine issue as to any material fact and that the party is

6   entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which

7   may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

8   (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable

9   jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary

10  judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*,

11  477 U.S. 317, 323–24 (1986).

12       In determining summary judgment, a court uses a burden-shifting scheme:

13       When the party moving for summary judgment would bear the burden of proof at
         trial, it must come forward with evidence which would entitle it to a directed verdict
14       if the evidence went uncontroverted at trial.  In such a case, the moving party has the
         initial burden of establishing the absence of a genuine issue of fact on each issue
15       material to its case.

16  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

17  omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or

18  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

19  an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

20  party failed to make a showing sufficient to establish an element essential to that party's case on

21  which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If

22  the moving party fails to meet its initial burden, summary judgment must be denied and the court

23  need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S.

24  144, 159–60 (1970).

25       If the moving party meets its initial burden, the burden then shifts to the opposing party to

1    establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

2    475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party

3    need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

4    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

5    versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

6    626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment

7    by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v.*

8    *List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions

9    and allegations of the pleadings and set forth specific facts by producing competent evidence that

10   shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

11         At the summary judgment stage, a court's function is not to weigh the evidence and

12   determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

13   U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are

14   to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely

15   colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

16   **III.    ANALYSIS**

17         **A.    Withdrawal of the Reference**

18         Withdrawal is mandatory if the issues in the adversary proceeding require material

19   consideration of non-bankruptcy federal law. The claims in the FAC require only the

20   interpretation of bankruptcy law and state law. Therefore, withdrawal is not mandatory. The

21   Court may withdraw the reference, however, "for cause shown," after considering efficiency

22   (which is enhanced when non-core issues predominate), delay and costs to the parties, uniformity

23   of bankruptcy administration, the prevention of forum shopping, and other related factors.

24         First, non-core issues heavily predominate. Eight of the nine causes of action are

25   common law contract or tort claims. These contract and tort claims are non-core, "related to"

1   claims over which the district court has jurisdiction under 28 U.S.C. § 1334(b) but which the

2   bankruptcy court cannot finally determine because they are not created or determined by Title 11

3   and are not administrative bankruptcy matters. *See In re Eastport Assocs.*, 935 F.2d at 1076–77.

4   Only one cause of action "arises under" the bankruptcy code—the claim for turnover of property

5   pursuant to 11 U.S.C. § 542—and Loomis argues that this claim is invalid, because Plaintiffs

6   seek to force a third party to turn over property that they do not own. Loomis correctly notes that

7   although a bankruptcy court has the power to determine whether property belongs to a debtor and

8   to force a third party to turn such property over to the bankruptcy estate, property *owed to* but not

9   *owned by* the debtor is not subject to a turnover proceeding under § 542. *See In re Kincaid*, 917

10  F.2d 1162, 1164–65 (9th Cir. 1990). The Ninth Circuit's statement on this issue is fairly clear.

11  The first cause of action attempts to recast the breach of contract and tort claims as a

12  consolidated, hybrid claim for turnover of property under § 542. It is clear from the FAC that

13  Plaintiffs do not seek the transfer of any property they own, but rather seek damages in contract

14  and tort. Unless and until Plaintiffs obtain a judgment in their favor, these amounts do not even

15  constitute a judgment debt, much less property subject to turnover under § 542. Furthermore,

16  several of the claims are intentional torts that could potentially support punitive damages far

17  above the value of the property sought in the § 542 turnover claim, even if that claim were

18  legitimate. The first factor therefore weighs very heavily in favor of withdrawal.

19          Second, the Court's decision to withdraw the reference will save time and money,

20  because nearly all of the claims in the adversary proceeding are non-core and will have to be

21  finally determined de novo by the Court after a second round of briefing in response to the

22  bankruptcy court's eventual recommendation. Third, the uniformity of bankruptcy

23  administration is not heavily implicated. And fourth, there is no indication of forum shopping.

24  Although mandatory withdrawal does not apply, the factors weigh heavily in favor of permissive

25  withdrawal.

1    Plaintiffs in their "Limited Response" state that they do not object to withdrawal

2  "provided, however, that (a) all parties consent to the jurisdiction of the District Court and agree

3  that the adversary proceeding may be fully and finally adjudicated in the District Court, and (b)

4  clarification is provided as to the extent to which the reference will be withdrawn." (Resp.

5  2:19–21, ECF No. 2).

6    The Court can satisfy the second condition simply by noting that the entire adversary case

7  will be withdrawn. The first condition is unclear but appears to be satisfied. First, the parties

8  need not consent to subject matter jurisdiction. Subject matter jurisdiction is the power of a court

9  to hear the matter before it. It either exists as a matter of law or it does not. Where it does not

10  exist, the parties cannot create it by consent. It exists in this case under 28 U.S.C. § 1334. It is in

11  fact the district court itself that has original jurisdiction over all bankruptcy matters. The

12  bankruptcy court is an arm of the district court to which most matters in bankruptcy are

13  automatically referred; hence, the present motion to withdraw the reference.

14    Second, perhaps Plaintiffs mean personal jurisdiction. But Plaintiffs need not condition

15  their acquiescence to the present motion on Defendants' submission to in personam jurisdiction.

16  Defendants have submitted to in personam jurisdiction as a matter of law by filing the present

17  motion with the Court—which act constituted a general appearance—to say nothing of

18  Defendants' appearances in the bankruptcy court.

19    Third, perhaps Plaintiffs mean to say that they do not object to *withdrawal* (not

20  "jurisdiction") if no other party objects. If this is what Plaintiffs mean, the condition is satisfied

21  because the time to respond to the present motion has long expired, and the nonmoving

22  Defendants, Insurcorp. and AIG Life Ins. Co., have not objected to it.

23    **B.    Summary Judgment**

24    Loomis principally argues that Herbst cannot have relied on anything Loomis represented

25  with respect to the policy negotiations or the quotes it provided, because Herbst did not even

1    know that Loomis was providing Insurcorp its quotes.  But the deposition of Nicholas Matthew

2    Osa, the Vice President of Human Resources for Herbst indicates, contrary to Loomis'

3    representations of that testimony, that Osa was fully aware of Loomis' role in assisting Insurcorp

4    with obtaining insurance quotes for Herbst. (*See* Osa Dep. 78:14–18, June 4, 2010, ECF No. 8

5    Ex. A).  Even if Herbst had had no idea Loomis was providing the quotes to Insurcorp that

6    Insurcorp was subsequently providing to Herbst, Herbst still could have relied on Loomis'

7    representations, because a plaintiff may rely on statements made indirectly to him. *In re Am.*

8    *Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1465 (D. Ariz. 1992) ("Indirect

9    reliance may be shown in a professional negligence case where purchasers are the foreseeable

10   recipients of a defendant's work."); *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000)

11   ("Indirect reliance allows a plaintiff to prove a fraud action when he or she heard a statement not

12   from the party that defrauded him or her but from that party's agent or from someone to whom

13   the party communicated the false statement with the intention that the victim hear it, rely on it,

14   and act to his or her detriment."); *see also Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278,

15   1283–84 (9th Cir. 1982) (reversing a district court's grant of summary judgment on a federal

16   securities fraud claim where plaintiffs showed a question of material fact as to indirect reliance);

17   *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975) (approving the indirect reliance theory in

18   the securities fraud context).  Although the Nevada Supreme Court does not appear to have

19   addressed the issue, the California Supreme Court has approved the theory:

20           [A] defendant's misrepresentation may be an "immediate cause" of a plaintiff's
         injury-producing conduct even though the defendant did not make the
21       misrepresentation directly to the plaintiff, and even though the plaintiff never heard
         or read the precise words of the misrepresentation.

22
                 The Restatement Second of Torts states the principle of indirect reliance this
23       way: "The maker of a fraudulent misrepresentation is subject to liability for
         pecuniary loss to another who acts in justifiable reliance upon it if the
24       misrepresentation, although not made directly to the other, is made to a third person
         and the maker intends or has reason to expect that its terms will be repeated or its
25       substance communicated to the other, and that it will influence his [or her] conduct
         in the transaction or type of transaction involved." (Rest. 2d Torts, § 533.)

1            Consistent with the Restatement position, this court has long recognized that
     a representation may be actionable even though it was not made directly to the party
2    seeking recovery.

3    *Mirkin v. Wasserman*, 23 Cal. Rptr. 2d 101, 119 (1993); *see also* 37 Am. Jur. 2d *Fraud and*

4    *Deceit* § 240 (2010).

5        **1.**    **Turnover of Property to the Estate Under 11 U.S.C. § 542**

6            As discussed, *supra*, there is no valid claim for transfer in this case.  The other claims are

7    all contract- or tort-based, and the claim for transfer is inherently predicated on the theory that

8    Plaintiffs "own" a potential future judgment on one or more of those other claims.  Plaintiffs

9    currently have no vested right in the value of any such potential judgment, and even if eventually

10   obtained, such a judgment will merely constitute a debt, not property owned by Plaintiffs that

11   would be transferable under § 542. *See In re Kincaid*, 917 F.2d at 1164–65.  The Court grants

12   summary judgment on the first cause of action.

13       **2.**    **Professional Negligence**

14           The elements of a cause of action in tort for professional negligence are: (1)
     the duty of the professional to use such skill, prudence, and diligence as other
15   members of his profession commonly possess and exercise; (2) the breach of that
     duty; (3) a proximate causal connection between the negligent conduct and the
16   resulting injury, and (4) actual loss or damage resulting from the professional's
     negligence.
17
     *Sorenson v. Pavlikowski*, 581 P.2d 851, 853 (Nev. 1978) (citing Prosser, *The Law of Torts* § 30,
18
     at 143 (4th ed. 1971); *Budd v. Nixen*, 491 P.2d 433 (Cal. 1971)).
19
             Plaintiffs allege they were damaged by: (1) Insurcorp's professional negligence in
20
     communicating with Plaintiffs and negotiating on their behalf; and (2) Loomis' untimely and
21
     inaccurate processing of Plaintiffs' claims under the Policies and failure to notify Plaintiffs that it
22
     didn't believe they had adequate information concerning the Policies' administration. (FAC
23
     ¶¶ 66–67).  Plaintiffs further allege that AIG is liable for the negligence of Loomis, because
24
     Loomis was acting as AIG's agent. (*Id.* ¶ 68).
25
             Loomis argues that Plaintiff has not established that Loomis owed any duty in a

1   professional capacity, because there was no contract between Herbst and Loomis. *See Warmbrodt*

2   *v. Blanchard*, 692 P.2d 1282, 1285 (Nev. 1984) (affirming summary judgment on a professional

3   malpractice claim where there was no issue of material fact that no contract existed between the

4   plaintiff and the defendant) ("It is the contractual relationship creating a duty of due care upon an

5   attorney [which is] the primary essential to a recovery for legal malpractice. . . . In the absence of

6   a contractual duty to plaintiffs to perform the act which plaintiffs alleged as a cause of their

7   damages, the court could properly find that there was no genuine issue of material fact."

8   (citations and internal quotation marks omitted)).

9          Here, it is not disputed that Herbst had no contract with Loomis with respect to the

10  negotiation of the Policies.  There was allegedly a contract to administer the Policies, but

11  Plaintiffs do not allege improper administration of the Policies.  They allege *proper*

12  administration of policies that had been negligently or fraudulently negotiated.  The Court

13  therefore grants summary judgment to Loomis on this cause of action.

14          **3.      Breach of Contract**

15          Plaintiffs allege that Insurcorp breached an oral agreement "to negotiate and manage

16  Plaintiffs' employee health insurance benefits policies" because it failed to negotiate the policies

17  in accordance with Plaintiffs' specifications, communicate material changes to the Policies, and

18  properly review the Policies prior to Plaintiffs' execution of them to ensure accuracy. (FAC

19  ¶¶ 74, 76).  Movants, Loomis, are not implicated by this cause of action.

20          **4.      Misrepresentation and Concealment**

21          Plaintiffs allege both intentional misrepresentation (common law fraud) and negligent

22  misrepresentation.  Nevada's punitive damages statute includes "concealment" under the

23  definition of fraud. *See Bongiovi v. Sullivan*, 138 P.3d 433, 451 (Nev. 2006) (citing Nev. Rev.

24  Stat. § 42.001(2)).

25  ///

**a.      Intentional Misrepresentation**

The elements of intentional misrepresentation in Nevada are:

1. A false representation made by the defendant;

2. Defendant's knowledge or belief that the representation is false (or insufficient basis for making the representation);

3. Defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation;

4. Plaintiff's justifiable reliance upon the misrepresentation; and

5. Damage to the plaintiff resulting from such reliance.

*Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992).  Under Rule 9(b), circumstances constituting fraud or mistake must be stated with particularity. Fed. R. Civ. P. 9(b).  This has been construed to require a plaintiff to "state precisely the time, place and nature of the misleading statements, misrepresentations and specific acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).  A plaintiff must plead facts such as "he bought a house from defendant, that the defendant assured him that it was in perfect shape, and that in fact the house turned out to be built on a landfill . . . ." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir 1996) (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)). The plaintiff must also "set forth an explanation as to why the statement or omission complained of was false and misleading." *In re GlenFed Sec. Litig.*, 42 F.3d at 1548.  As discussed, Loomis' liability on misrepresentation claims is not precluded merely by virtue of the fact that Herbst's reliance on Loomis' alleged misrepresentations was indirect, so long as Loomis knew its statements would be relied on a third party.

Plaintiffs allege that AIG and Loomis, as AIG's agent: (1) intentionally concealed that Loomis had failed to timely and completely process the payment of all claims due under the Policies; (2) intentionally concealed that the "level rate increase" Loomis promised for the 2008 Policy included only fixed costs and not aggregate claims costs; (3) affirmatively misrepresented

1    that the 2007 Policy was for 12 month/15 month coverage and contained prescription coverage in

2    both the specific and the aggregate; and (4) affirmatively misrepresented that the 2008 Policy

3    would not increase Plaintiffs' total costs, i.e., that Plaintiffs' maximum liability under the 2008

4    Plan would be $2,350,000. (FAC ¶¶ 104–06).

5          Loomis argues that Mr. Osa, Herbst's Vice President of Human Resources, signed the

6    2007 Policy without reading it, and that he relied solely on Insurcorp, who presented the written

7    document to him. Loomis argues "[a]t most, Loomis represented that it was able to maintain the

8    rates for the Policies. Even then, it is undisputed that the (previous) rates were the same." (Mot.

9    Summ. J. 21:27–28, ECF No. 8). A plaintiff's reliance on statements must be justifiable to

10   support a claim for fraud. Here, it is not disputed that Loomis' representations to Plaintiffs were

11   indirect, and that Insurcorp dealt directly with Plaintiffs and presented the documents for signing.

12   There is a question of fact as to whether Herbst's reliance on Insurcorp's representations up to

13   and including the moment of signing were justifiable when Herbst, a sophisticated actor, had the

14   written contract in front of it when it signed and that contract included material terms different

15   from what had been previously agreed. A reasonable jury could determine that Herbst justifiably

16   relied on Insurcorp's statements at signing—statements such as "this contract you are about to

17   sign contains the terms previously agreed to." A reasonable jury could also fail to find justifiable

18   reliance under these circumstances.

19         Although there is no allegation that a Loomis representative ever made any such

20   statement, Herbst alleges that it signed the agreements under assumptions based on

21   representations made to it from Insurcorp that originated with Loomis. Herbst also alleges that

22   Loomis knew there was an error in the written contract and that it affirmatively concealed this

23   fact from Herbst. A reasonable jury could find that Herbst indirectly and justifiably relied on the

24   affirmative statements made by Loomis concerning the terms of the 2007 Policy, and that

25   although only Insurcorp affirmatively misrepresented the contents of the 2007 policy at signing,

1   Loomis intentionally concealed from Insurcorp and Herbst the fact that the written policy

2   differed from the previous quote it gave to Insurcorp for the use of third parties such as Herbst.

3   There remains a question of fact as to whether Insurcorp, Loomis, or both are liable for

4   intentional misrepresentation.  Loomis has not met its burden on summary judgment to show a

5   lack of a material question of fact on this point.  It simply argues that its involvement was

6   indirect, which is of no import, and that Mr. Osa cannot have justifiably relied on representations

7   that he would have known were false had he read the agreements before signing them, which is a

8   question of fact.  The Court denies summary judgment on this cause of action.

9         **b.**    **Negligent Misrepresentation**

10         The tort of negligent misrepresentation in Nevada is defined by the Restatement (Second)

11   of Torts:

12         In *Bill Stremmel Motors, Inc. v. First Nat'l Bank of Nevada*, 94 Nev. 131,
      134, 575 P.2d 938, 940 (1978), we adopted the Restatement (Second) of Torts § 552
13   definition of the tort of negligent misrepresentation:

14         (1) One who, in the course of his business, profession or employment, or in
      any other action in which he has a pecuniary interest, supplies false
15   information for the guidance of others in their business transactions, is
      subject to liability for pecuniary loss caused to them by their justifiable
16   reliance upon the information, if he fails to exercise reasonable care or
      competence in obtaining or communicating the information.

17   *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) (quoting Restatement (Second) of

18   Torts § 552 (1)).  One federal judge, ruling on a case from this District, has enumerated the

19   elements:

20         1) a representation that is false; 2) that the representation was made in the course
      of the defendant's business or in any action in which he has a pecuniary interest;
21   3) the representation was for the guidance of others in their business transactions;
      4) the representation was justifiably relied upon; 5) that such reliance resulted in
22   pecuniary loss to the relying party; and 6) that the defendant failed to exercise
      reasonable care or competence in obtaining or communicating the information.

23

24   *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 460 F. Supp. 2d 1246, 1262 (D. Nev.

25   2006) (Ezra, J.).  Negligent misrepresentation must also be pled with particularity. Fed. R. Civ.

1   P. 9(b).

2       Plaintiffs allege Insurcorp and Loomis had a pecuniary interest in the Policies and

3   breached their duty to obtain and communicate accurate information about the Policies to

4   Plaintiffs. (FAC ¶¶ 80–81). Plaintiffs further allege that AIG is liable for the negligence of

5   Loomis, because Loomis was acting as AIG's agent. (*Id.* ¶ 82). For the same reasons the Court

6   denies summary judgment on the fraud claim, it denies it on this claim.

7       **5.    Breach of Fiduciary Duty and Tortious Breach of the Implied Covenant of
            Good Faith and Fair Dealing**

8

9       Every contract gives rise to a duty not to act arbitrarily or unfairly to the detriment of the

10  other party. *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007). Breach of this duty is a tort different

11  in nature from a claim for breach of contract. *See Ins. Co. of the West v. Gibson Tire Co., Inc.*,

12  134 P.3d 698, 702 (Nev. 2006). A bad faith claim is predicated on the abuse of a fiduciary

13  relationship existing between parties to certain kinds of contracts; it does not arise simply from a

14  particularly egregious or willful breach of a contract, as litigants often imply by reflexively

15  pleading bad faith along with nearly every breach of contract claim:

16      Although every contract contains an implied covenant of good faith and fair dealing,
        an action in tort for breach of the covenant arises only "in rare and exceptional cases"
        when there is a special relationship between the victim and tortfeasor. A special
17      relationship is "characterized by elements of public interest, adhesion, and fiduciary
        responsibility." Examples of special relationships include those between insurers and
18      insureds, partners of partnerships, and franchisees and franchisers. Each of these
        relationships shares "a special element of reliance" common to partnership,
19      insurance, and franchise agreements. We have recognized that in these situations
        involving an element of reliance, there is a need to "protect the weak from the insults
20      of the stronger" that is not adequately met by ordinary contract damages. In addition,
        we have extended the tort remedy to certain situations in which one party holds
21      "vastly superior bargaining power."

22  *Id.* (footnotes omitted). The Washington Supreme Court has similarly described the bad faith

23  tort as "the intentional abuse of a fiduciary relationship." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d

24  1124, 1126 (Wash. 1998). Accordingly, the most common and appropriate targets of bad faith

25  claims are insurers. *See, e.g., Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009).

Plaintiffs allege Insurcorp owed them a fiduciary duty as their broker and agent in
advising, negotiating, and managing the Policies, that Loomis owed them a fiduciary duty as a
third-party administrator, and that AIG owed a fiduciary duty as their insurer both directly and
through its insurance agent, Loomis. (FAC ¶¶ 87–90). Plaintiffs argue that the facts alleged
constitute breaches of all Defendants' fiduciary duties. (*Id.* ¶ 91). Plaintiffs also argue that AIG
and Loomis, as AIG's agent, were in a superior or trusted position with respect to Plaintiffs and
breached their duties of good faith by engaging in the acts detailed in the FAC, specifically, by
making material misrepresentations and omissions. (*Id.* ¶¶ 116–19).

Plaintiffs have sufficiently alleged this claim as against AIG to survive a motion to
dismiss. They specifically allege that AIG was their insurer, and that Loomis, who made certain
misrepresentations to Plaintiffs, was AIG's agent. They also allege that Loomis itself was a
fiduciary because it was the third-party administrator of the Policies. AIG and Insurcorp
plausibly breached their duty of good faith by presenting for execution a policy that did not
reflect the previous negotiations, without making this fact conspicuously known before
execution, and then failing voluntarily to reform the contract to reflect the original intent of the
parties.

Loomis as a mere plan administrator, however, was a fiduciary only with respect to
*administration* of the Policies—i.e., the payment or denial of claims to Plaintiffs'
employees—not *negotiation and execution* of them. Plaintiffs do not allege any damage via the
administration of claims under the text of the policies *as written*, but only via the negotiation and
execution of the policies before they went into effect. In other words, Plaintiffs allege damage
resulting from the *proper* administration of the Policies—policies that did not properly reflect the
intent of the parties or the representations made by Loomis and others. Loomis' fiduciary duty
faithfully to administer the Policies did not extend to fighting Herbst's battles with respect to the
very validity of the Policies *ex ante*. Although Loomis may be liable for misrepresentation based

Page 19 of 22

1   on Plaintiffs' indirect reliance on Loomis' statements to Insurcorp concerning the policy quotes,

2   and although the fact that Loomis was also the administrator of the Policies may aggravate such a

3   claim, Loomis is not liable for bad faith as to the negotiation and execution of the policies

4   because it was not a fiduciary in this regard.  No agreement, written or otherwise, is alleged to

5   have existed between Plaintiffs and Loomis for assistance in obtaining coverage.  This was the

6   sole duty of Insurcorp.  The Court therefore grants Loomis' motion for summary judgment as

7   against these causes of action.

8        **6.      Fraud in the Inducement**

9        Plaintiffs allege Defendants purposely misrepresented the terms of the Policies to induce

10  Plaintiffs to execute them by telling Plaintiffs: (1) the 2007 Policy was a 12 month/15 month

11  policy that covered prescriptions in both the specific and the aggregate; and (2) the changes to the

12  2008 Policy would not include an increase in total costs, such that Plaintiffs' liability would not

13  exceed $2,350,000. (FAC ¶¶ 86–97).  Insofar as this claim is meant to be distinct from the

14  misrepresentation claims already addressed, it constitutes a defense to enforcement of a contract,

15  not a separate cause of action, and the present movant, Loomis, is not alleged to have been a

16  party to the Policies, but a third-party administrator of them, as selected by the parties in the

17  Policies.  Therefore, the Court need not address this claim at this time.

18       **7.      Reformation of Contract**

19       Reformation of a contract is an appropriate equitable remedy in the case of fraud or

20  mistake.  With respect to fraud:

21           If a party's manifestation of assent is induced by the other party's fraudulent
         misrepresentation as to the contents or effect of a writing evidencing or embodying
22       in whole or in part an agreement, the court at the request of the recipient may reform
         the writing to express the terms of the agreement as asserted,
23
         (a) if the recipient was justified in relying on the misrepresentation, and
24
         (b) except to the extent that rights of third parties such as good faith purchasers for
25       value will be unfairly affected.

1    Restatement (Second) of Contracts § 166 (1981); *see NOLM, LLC v. Cnty. of Clark*, 100 P.3d

2    658, 661 (Nev. 2004) (quoting *id.*).  "Reformation is more broadly available for fraudulent

3    misrepresentation than for mistake." Restatement (Second) of Contracts § 166 cmt. a (1981)

4    (citing *id.* § 155).  With respect to mistake:

5              The province of reformation is to make a writing express the agreement that
         the parties intended it should.  Under the rule stated in this Section, reformation is
6         available when the parties, having reached an agreement and having then attempted
         to reduce it to writing, fail to express it correctly in the writing.  Their mistake is one
7         as to expression--one that relates to the contents or effect of the writing that is
         intended to express their agreement-- and the appropriate remedy is reformation of
8         that writing properly to reflect their agreement.  For the rule stated in this Section to
         be invoked, therefore, there must have been some agreement between the parties
9         prior to the writing.  The prior agreement need not, however, be complete and certain
         enough to be a contract.
10
     Restatement (Second) of Contracts § 155 cmt. a (1981).
11
          Plaintiffs argue that they are entitled to a reformation of the Policies to accurately reflect
12
     the intent of the parties. (FAC ¶¶ 123–29).  This cause of action is strongly supported on the facts
13
     alleged under either a fraud or mistake theory.  The facts alleged make plausible either that
14
     Defendants intentionally concealed the contents of the writing, or that all parties were ignorant of
15
     the contents of the writing, and that the writing did not accurately reflect the prior agreement and
16
     the intent of the parties.
17
          Loomis argues that Herbst is not entitled to reformation because there was no mistake or
18
     fraud.  Loomis supports this conclusion by noting that the terms of the written contract were
19
     unambiguous.  This is relevant to interpretation of the contract as written, but it is inapposite to
20
     determination of a claim for equitable reformation based on fraud or mistake.  Issues of fraud and
21
     mistake affect the validity of the contract as written and are therefore antecedent to the contract's
22
     interpretation.  The question is not whether the terms of the written agreement were confusing or
23
     ambiguous, but whether Loomis intentionally concealed the contract's terms from, or
24
     misrepresented them to, Herbst, or whether both parties were ignorant of what the written
25
     agreement stated.

1    Finally, Loomis argues that reformation is not appropriate because Mr. Osa "failed to

2   meet his affirmative duty to read the Policies before he signed it and/or recommended it for

3   execution." (Mot. Summ. J. 23:23–24).  In at least one state, failure to read a contract where there

4   is an opportunity to do so and without a sufficient excuse will prevent the equitable remedy of

5   reformation on a claim of unilateral mistake. *Sheldon v. Hargose*, 100 S.E.2d 898, 900 (Ga.

6   1957).  However, "[r]eformation of an agreement can be awarded if one party has knowledge that

7   the other party suffers from a unilateral mistake." *Graber v. Comstock Bank*, 905 P.2d 1112,

8   1116 (Nev. 1995) (citing *Ga. Pac. Corp. v. Levitz*, 716 P.2d 1057 (Ariz. Ct. App. 1986)).  Herbst

9   alleges that Loomis knew it was operating under a mistake as to the contents of the 2007 Policy.

10   Loomis has not negated this allegation with evidence.  The Court denies summary judgment on

11   this cause of action.

12                                  **CONCLUSION**

13          IT IS HEREBY ORDERED that the Motion to Withdraw Reference (ECF No. 1) is

14   GRANTED.

15          IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 8) is

16   GRANTED in part and DENIED in part.  The motion is granted with respect to transfer under

17   § 542, professional negligence, breach of fiduciary duty, and bad faith, but denied with respect to

18   intentional misrepresentation, negligent misrepresentation, and reformation.

19          IT IS SO ORDERED.

20          Dated: December 29, 2010

21

22                                  ROBERT C. JONES
                                    United States District Judge

23

24

25

Page 22 of 22